UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MIBELLOON DAIRY, LLC,

                Plaintiff,                Case No. 1:21-cv-29

v.                                  Hon. Paul L. Maloney

PRODUCERS AGRICULTURE
INSURANCE COMPANY, RLS, LIMITED,
and, JESSICA GODLEY,

                Defendants.

and

RLS, LIMITED, d/b/a BRECKENRIDGE
INSURANCE AGENCY and
JESSICA GODLEY,

                Cross-Plaintiffs,

v.

PRODUCERS AGRICULTURE
INSURANCE COMPANY,

                Cross-Defendant
_____/

## REPORT AND RECOMMENDATION

        Plaintiff Mibelloon Dairy, LLC ("Mibelloon") filed the present lawsuit against defendants Producers Agriculture Insurance Company (variously referred to as "Producers" or "ProAg"), RLS, Limited, a corporation d/b/a Breckenridge Insurance Agency ("Breckenridge"), and Jessica Godley ("Godley"). *See* Amended Compl. (ECF No. 16). Defendants Breckenridge and Godley filed an amended cross-complaint against co-defendant Producers (ECF No. 19). This

matter is now before the Court on Producers' motion to dismiss the amended cross-complaint and compel arbitration against cross-claimants Breckenridge and Godley (ECF No. 30).

## I.    The Amended Complaint

Mibelloon set forth the following allegations in its amended complaint.  Mibelloon is a Michigan limited liability company which does business in Midland County, Michigan. Amend. Compl. (ECF No. 16, PageID.192).  Producers is engaged in the business of issuing federally reinsured crop insurance, which is subject to the Federal Crop Insurance Act (FCIA), 7 U.S.C. § 1501, *et seq.*, and federal rules and regulations, including those found in Chapter IV of Title 7 of the Code of Federal Regulations.  *Id*. at PageID.193.  This case involves insurance coverage known as Dairy Revenue Protection (DRP), which protects dairy producers from revenue loss caused by fluctuations in the market price of dairy products.  *Id*.  DRP is federally subsidized and federally insured.  *Id*. at PageID.193-194.  DRP is a pilot program that was submitted pursuant to the FCIA and approved by the Board of the Federal Crop Insurance Corporation (FCIC) in accordance with 7 U.S.C. § 1508(h) and has been available since the first quarter of 2019. *Id*.

Mibelloon explains that:

11. The DRP premium rate varies depending on the state of the dairy market. Almost every business day, the Risk Management Agency (RMA), an agency of the federal government, publishes expected dairy prices, which are used to calculate premium rates for the DRP. Expected dairy prices, and thus DRP premium rates, vary on a daily basis.

12. The RMA generally publishes the expected dairy price for any given day in the late afternoon. On any given day, a farmer purchasing DRP coverage can "lock in" the day's premium rate and future milk prices for up to five upcoming quarters.

*Id*. at PageID.194.

The method for "locking in" is through the purchase of an endorsement to the base DRP insurance policy known as a "quarterly coverage endorsement" (or "QCE").  *See id*. at ¶ 19,

PageID.195.  Under the DRP insurance policy, a QCE is defined as "[a]n endorsement to the policy necessary to provide coverage that includes information about the quarterly insurance period and coverage options."  DRP at ¶ 1 (Definitions) (ECF No. 16-2, PageID.257).  As explained in the *Dairy Revenue Protection Insurance Standards Handbook 2019 and Succeeding Crop Years* ("*Handbook*") (ECF No. 16-1),

> The quarterly coverage endorsement is required to obtain Dairy Revenue Protection coverage.  A quarterly coverage endorsement must be submitted on the AIP's [Approved Insurance Provider's] form within the sales period for each quarterly insurance period in which the insured elects coverage.  There can be multiple quarterly coverage endorsements for the same quarterly insurance period but they cannot cover the same pounds of milk.

*Handbook* at PageID.209.

Mibelloon alleged that it and Producers entered into a contract for DRP insurance coverage in October 2018, when Mibelloon submitted its application for DRP and Producers accepted it in October 2018.  *See* Amend. Compl. at ¶ 14, PageID.194.  Mibelloon's present claims arise from this DRP insurance policy, no. 26-978-5000046.  *Id.* at ¶ 20.  The policy is attached to the amended complaint as Exh. B (ECF No. 16-2).  Under this policy, Mibelloon alleged that commencing in October 2018, it successfully ordered QCEs from Producers for the second, third and fourth quarters of 2019 and the first quarter of 2020.  Amend. Compl. at PageID.194.

This lawsuit arises from incidents which occurred in 2020, when Mibelloon sought to order QCEs under the DRP insurance policy for the second, third and fourth quarters of 2020.  *Id.* at PageID.195.  To accomplish this, on January 20, 2020, Mibelloon contacted Godley, identified as Producers' "agent at Breckenridge."  *Id.*  Mibelloon points out that both Godley and Breckenridge are Producers' agents in accordance with 7 C.F.R. § 400.701.  *Id.*  This regulation defines the term "agent" as

> An individual licensed by the State in which an eligible crop insurance
> contract is sold and serviced for the reinsurance year, and who is employed by, or
> under contract with, the approved insurance provider, or its designee, to sell and
> service such eligible crop insurance contracts.

7 C.F.R. § 400.701.

Because the RMA did not release expected prices on January 20th (a holiday),
Godley emailed Mibelloon the expected prices on the next day. *Id*. Mibelloon confirmed that it
wanted to "lock in" to these "rates" (January 21, 2020) and purchase endorsements. *Id*. On the
afternoon of January 21, 2020, Mibelloon entered into six QCEs with Producers, through its agents
Godley and Breckenridge. *Id*. Mibelloon identified the QCEs as for the second, third and fourth
quarters of 2020. *Id*. *See* QCEs (ECF Nos. 16-3, 16-4, and 16-5).

Producers (referred to as "Pro Ag") allegedly failed "to timely transmit information
to the RMA" and denied liability under the requested QCEs:

> 21. The effective date listed on each QCE is January 21, 2020. This is in keeping
> with the Dairy Revenue Protection Insurance Policy, which defines the effective
> date of a policy as: "The date coverage begins, as shown in the quarterly coverage
> endorsement. The effective date will always be the date the prices were published
> on the RMA website corresponding to your purchase date." Exhibit B, §1,
> "Definitions."
>
> 22. Pro Ag was required to timely transmit information regarding QCEs sold during
> the preceding sales period to RMA.
>
> 23. On May 4, 2020 (in the middle of Q2 2020), Pro Ag mailed a letter to Plaintiff
> purporting to deny liability for all three quarters, based on Pro Ag's admitted failure
> to timely transmit information to the RMA. *See* Exhibit F, May 4 Denial Letter
> from Pro Ag.
>
> 24. The May 4, 2020 letter states that "for the QCE to be accepted, it must clear all
> of RMA's PASS edits by noon CST, and if it does not, liability must be denied and
> the QCE must be reapplied for, as soon as the next day, if the insured chooses to do
> so." *Id*.
>
> 25. The letter continues, "ProAg received a QCE for the above-mentioned DRP
> policy. The information . . . was not transmitted to RMA timely. As a result of the
> QCE not clearing all RMA PASS edits prior to noon CST, ProAg has no other

4

alternative but to deny liability. This letter is notification that liability has been denied on the QCE submitted for the sales period beginning on January 21st for the above-mentioned policy." *Id.*

26. Nothing in the DRP Insurance Policy or the QCEs makes insurance coverage contingent on "clearing all of RMA's PASS edits by noon CST," or on "the QCE [being] accepted."

27. Nothing in the Federal Crop Insurance Act (7 U.S.C. § 1501, *et seq.*), the associated regulations (7 C.F.R. chapter IV), or FCIC procedure makes insurance coverage contingent on "clearing all of RMA's PASS edits by noon CST," or on "the QCE [being] accepted."

28. Nevertheless, Defendant Pro Ag has refused to honor its contracts with Plaintiff.

*Id.* at PageID.195-196 (emphasis omitted).

Mibelloon alleged that "[b]y the time defendant Pro Ag informed Plaintiff that it had failed to obtain the coverage Plaintiff requested, it was too late for Plaintiff to sign new QCEs for Q2 2020." *Id.* at PageID.197.  Because the market price of milk dropped in the second quarter, Mibelloon suffered large revenue losses on its QCEs for that time, and "expects the total amount of indemnity due for Q2 2020 to be approximately $577,830.00." *Id.*  In addition, Mibelloon "suffered revenue losses on one of its two Q3 2020 QCEs" and "expects the total amount of indemnity due for Q3 2020 to be approximately $335,250.00." *Id.*  In addition, Mibelloon "anticipates suffering revenue losses on one of its two Q4 2020 QCEs" and "expects the total amount of indemnity due for Q4 2020 to be approximately $300,000.00." *Id.*  In summary, "Pro Ag has refused to pay Plaintiff the indemnity Plaintiff is owed under any of the January 21, 2020 policies [*i.e.*, the six QCEs]." *Id.*

Mibelloon further alleged that,

34. After May 4, 2020, when Pro Ag informed Plaintiff that liability was denied on all six contracts it had entered into with Plaintiff on January 21, 2020, Plaintiff sought to ensure that it would have DRP coverage for Q3 and Q4 2020 on the agreed terms.

5

35. Meanwhile, premium rates had skyrocketed and milk prices had collapsed.  The total premium for Q3 and Q4 on January 21, 2020 was $45,017.  By June 3, 2020, total premium had increased to $106,500.

36. Pro Ag represented that if Plaintiff signed new QCEs for Q3 and Q4 2020, that Pro Ag would cover the difference in premium.

*Id*.

However, that did not occur:

37.  After months of assurances that Pro Ag would cover the difference, Pro Ag, on August 17, 2020 (after it was too late for Plaintiff to sign a new Q3 2020 QCE), reneged on its promise and refused to cover the increase in premium unless Plaintiff agreed to sign a document conditioning Pro Ag's premium refund on Plaintiff's signing a release of any claim arising out of the January 21, 2020 Q3 and Q4 2020 policies.

*Id*. at PageID.198.

Mibelloon's amended complaint alleged three causes of action.  In Count I (breach of contract) Mibelloon claims that Producers entered into six QCEs on January 21, 2020, and that Producers "breached those contracts by its letter of May 4, 2020" which denied Producers' contractual liability.  *Id*.  The breach resulted in revenue losses of $577,830.00 in the second quarter of 2020, $335,250.00 in the third quarter of 2020, and approximately $300,000.00 in the fourth quarter of 2020.  *Id*.  In Count II (state law claim for negligence of defendants) Mibelloon claims that Producers and its agents Breckenridge and Godley were negligent in failing to timely transmit the required information in Mibelloon's QCEs to RMA.  *Id*. at PageID.199.  In Count III (state law claim for misrepresentation of defendants) Mibelloon claims that "defendants" made a false representation to plaintiff "that they had secured the DRP insurance coverage which Plaintiff ordered."  *Id*. at PageID.200.

## II.     The amended cross-complaint

In response to the amended complaint, Breckinridge and Godley filed their amended cross-complaint which alleged as follows.   On November 11, 2009, Producers and Breckenridge entered into a Crop Insurance Agency Agreement ("agency agreement") for the purpose of Breckenridge selling and servicing Multi Peril Crop Insurance, Crop Hail Insurance, and Named Peril Insurance policies on behalf of Producers.   Amended Cross-Complaint at PageID.299.  Producers and Breckenridge renewed the agency agreement on January 17, 2011 and September 25, 2020.  *Id*.  As a crop insurance agent, Breckenridge was authorized to sell DRP on behalf of Producers.  *Id*.  Pursuant to the agency agreement, Producers agreed to provide the necessary materials, such as the approved applications, forms and policies used by Breckenridge in the insurance transactions provided on behalf of Producers.  *Id*.

On January 20, 2020, Godley received Mibelloon's e-mail request for six types of DRP coverages for the second, third, and fourth quarters of 2020.  *Id*.  On January 21, 2020, Godley entered the necessary information into Producer's computer-based QCE form.  *Id*.  On that same day, Producer's representative, Grady Stehr ("Stehr") confirmed for Godley that Producers had received the necessary information for the QCE and promised an insurance schedule would be ready the next day.  *Id*.

"On January 27, 2020, after Ms. Godley followed-up with Mr. Stehr once she realized the promised insurance schedule for Mibelloon remained unavailable, Pro Ag, once again, confirmed to Breckenridge there were no errors with the QCE and that the United States Department of Agriculture Risk Management Agency ("RMA") was just behind on accepting endorsements."  *Id*. at PageID.299-300.

Some weeks later, on March 12, 2020, "Godley once again realized the schedule remained unavailable notwithstanding Pro-Ag's multiple prior assurances." *Id*. at PageID.300. "Pro Ag then promised it would resolve any issues with the QCE and that the problem would be an 'easy fix' through the RMA based upon past practice." *Id*. "On March 25, 2020, [Producers] changed course and, for the first time, informed Breckenridge, the RMA failed to accept Mibelloon's insurance endorsements." *Id*.

The following series of events occurred during the weeks and months after Producers informed Breckenridge that RMA failed to accept the QCEs:

17. On May 5, 2020, Ms. Godley contacted Jason Blubaugh ("Mr. Blubaugh"), a National Sales Manager for Pro Ag, regarding the pending appeal with the RMA. Mr. Blubaugh did not return Ms. Godley's phone call until May 18th. During this call, Ms. Godley outlined Breckenridge's position it did nothing wrong and reiterated Mr. Stehr's affirmations there were no problems with the QCE. As part of this call, Pro Ag admitted "false readings" on Pro Ag's system which hosted the QCE.

18. On May 18th and May 19th, Mr. Blubaugh and Ms. Godley exchanged emails wherein Ms. Godley reiterated Breckenridge's defenses and attached two (2) screen shots in support of the agency, one from January 21st detailing the information she inputted into the Pro Ag Works System as well as a separate screen shot indicating the pounds and premiums from the QCE, which in turn suggested the QCE were added to the Policy. Exhibit D.

19. On May 28th, Ms. Godley and Breckenridge's President and Owner, Rob Fleming ("Mr. Fleming), spoke with Mr. Blubaugh over the phone.  <u>During this call, Mr. Blubaugh did an about face and contradicted Mr. Stehr's prior assurances and alleged RMA denied the appeal based on the absence of timely signatures on the QCE.</u>

20. On August 17th, after numerous delays caused by Pro Ag, Ms. Godley and Mr. Fleming conducted another telephone conference with Mr. Blubaugh.  During this conference, Pro Ag took an aggressive and unsubstantiated position, claiming Breckenridge was 100% responsible for Mibelloon's lack of coverage. As part of this call, Mr. Blubaugh admitted Mr. Stehr participated in the aforementioned phone conversations on January 21st and January 27th referenced above, but refused to admit Mr. Stehr's made the assertions he made about Mibelloon's coverage, claiming Mr. Stehr failed to draft notes during the call.

8

21. On or about September 24, 2020, Breckenridge's insurer sent a demand letter to Pro Ag demanding it provide coverage to Mibelloon as requested in the pending First Amended Complaint due to Pro Ag's conduct in assuring Breckenridge there would be coverage, then failing to provide the same. Exhibit E. This letter elicited a verbal denial of coverage by Pro Ag.

22. Pro Ag's continued denials eventually led to Mibelloon's January 11, 2021, instant Complaint.

*Id*. at PageID.300-301 (emphasis in original).

Breckenridge and Godley have eight cross-claims against Producers.  In Count I (breach of contract) they allege: that Producers contracted with Breckenridge to perform its duties as an insurance company and provide Breckenridge with the necessary forms to use in the insurance transactions provided on behalf of Producers; that Producers provided Breckenridge with faulty forms or otherwise failed to provide Breckenridge with the necessary materials for Breckenridge to use in the transaction of the insurance business; and that Producers breach of its duties to provide Breckenridge the necessary forms and materials to use in the insurance transactions has or may proximately result in liability and damages to Breckenridge in favor of Mibelloon.  *Id*. at PageID.301-302.

In Count II (implied contractual indemnification) they allege: that the agency agreement carried with it the implied obligation of Producers to exercise reasonable care in the performance of the agreement; that if Mibelloon's allegations about its DRP coverage for the second, third, and fourth quarters of 2020 are true, Mibelloon's claims of negligence and misrepresentation against them are claims of passive negligence or vicarious liability; that their liability to Mibelloon constitutes vicarious liability from the active negligence of Producers; that Producers implicitly agreed to indemnify them for Producers' negligence in handling Mibelloon's attempts to obtain DRP; and that Producers' breach of its implied indemnity agreement has or may proximately result in liability and damages to them in favor of Mibelloon.  *Id*. at PageID.302-303.

In Count III (common law indemnification) they allege: that Mibelloon filed the complaint against them solely as a result of Producers wrongfully failing to correct the technical issues in its QCE form and wrongfully informing them that the RMA would approve the requested DRP coverage; that their liability to Mibelloon constitutes vicarious liability from the active negligence of Producers; that they were free from negligence and misrepresentation in this case; that their liability to Mibelloon, if any, is vicarious in nature; and that they are entitled to common law indemnity over and against Producers because of Producers' active negligence in failing to properly perform its duties and services. *Id*. at PageID.303-304.

In Count IV (innocent misrepresentation) they allege: that Producers innocently misrepresented to them that the QCE form contained no errors and the RMA would approve the requested DRP coverage; that Producers' innocent misrepresentation was deceptive as to them; and that the deceptive nature of Producers innocent misrepresentations "as to the QCE form and the confirmations the RMA would approve the QCE for Mibelloon" caused them damages in the form of defending the instant lawsuit and being subject to a potential judgment in light of their input of data into the QCE form. *Id*. at PageID.304-305.

In Count V (negligent misrepresentation) they allege: that Producers had a duty to them not to misrepresent material information pertinent to their ability to perform services as an independent insurance agent; that Producers breached its duty to them by negligently misrepresenting to them on multiple occasions the QCE form contained no errors and assuring them that the RMA would approve the requested DRP coverage for Mibelloon; that Producers intended them to rely on its confirmations there was nothing wrong with the QCE form; that based on Producers' confirmations, they had no reason to investigate further or alert Mibelloon; that Producers breach and negligent misrepresentation caused them damages in the form of defending

the instant lawsuit and being subject to a potential judgment in light of Producers' input of the data into the QCE form; and that if Mibelloon is successful in its claims against them, Producers will benefit since it will not be liable for the total amount of Mibelloon's damages.  *Id*. at PageID.305-306.

In Count VI (intentional misrepresentation) they allege: that Producers informed them on multiple occasions the QCE form contained no errors and the RMA would approve the requested coverage; that Producers' representations to them were false; that Producers recklessly confirmed the QCE form contained no errors without investigating further and discovering the 'false positives' showing up in their system; that Producers intended them to reasonably rely on its confirmations that there was nothing wrong with the QCE form; that based on Producers' confirmations, they had no reason to investigate further or to alert Mibelloon other than the actions they took in this case; and that Producers' intentional misrepresentation caused them damages in the form of defending the instant lawsuit and being subject to a potential judgment in light of their input of the data into the QCE form.  *Id*. at PageID.306-307.

In Count VII (silent fraud) they allege: that Producers informed them on multiple occasions the QCE form contained no errors and the RMA would approve the requested coverage; that if Mibelloon's allegations about its DRP coverage for the second, third, and fourth quarters of 2020 are true, Producers' representations to them were false; that Producers recklessly confirmed the QCE form contained no errors without investigating further and discovering the "false positives" showing up in their system; that Producers intended them to rely on its confirmations that there was nothing wrong with the QCE form; that based on Producers' confirmations, they had no reason to investigate further or alert Mibelloon other than the actions they took in this case; that under the agency agreement, Producers had a duty to disclose to them when its QCE form

11

malfunctioned or experienced technical issues resulting in the failure of coverage; that Producers breached its duty to disclose when it failed to notify them that the QCE malfunctioned or experienced technical issues at the time they input the data related to Mibelloon's request for DRP coverage; that Producers' breach and silent fraud caused them  damages in the form of defending the instant lawsuit and being subject to a potential judgment in light of their input of the data into the QCE form.  *Id*. at PageID.307-308.

In Count VIII (fraud in the inducement) they allege: that if Mibelloon's allegations about its DRP coverage for the second, third, and fourth quarters of 2020 are true, Producers knew or should have known the QCE form was experiencing technical issues and/or contained errors; that if Producers' alleged knowledge about the QCE form's technical issues and/or errors were material facts pertinent to their ability to perform as an insurance agent and obtain DRP coverage for Mibelloon; that Producers' representations about the QCE form were false and such representations were done to mislead them into believing the RMA would approve the requested coverage for Mibelloon; that Producers knew its QCE form was malfunctioning or, at a minimum, made representations about the QCE form containing no errors with reckless disregard for the accuracy of the representations; that they relied upon Producers' misrepresentation that the QCE contained no errors and the RMA would approve the requested coverage for Mibelloon; and, that as a result of their reliance on Producers' knowing misrepresentation, they have suffered damages which include, but not are limited to, having to defend the instant lawsuit and being subject to a potential judgment in light of their input of data into the QCE form.  *Id*. at PageID.308-309.

**III.      Producer's motion to dismiss the amended cross-complaint**

**A.      Legal Standard**

Producers seeks to dismiss the amended cross-complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9 U.S.C. § 4, because all of the cross-claims are subject to arbitration under the January 17, 2011 agency agreement. *See* Motion (ECF No. 30); Producer's Brief (ECF No. 31 PageID.480-481). "[T]his court has held that a party's 'failure to pursue arbitration' in spite of a compulsory arbitration provision means that the party 'has failed to state a claim,' meaning that a motion to dismiss on such grounds is 'properly construed as a motion . . . under Rule 12(b)(6).'" *Knight v. Idea Buyer, LLC*, 723 Fed. Appx. 300, 301 (6th Cir. 2018), quoting *Teamsters Local Union 480 v. United Parcel Service, Inc.*, 748 F.3d 281, 286 (6th Cir. 2014). A complaint may be dismissed for failure to state a claim if it fails to give the defendants a fair notice of the claim and the grounds upon which it rests. *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007).

> [A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted).

In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). In this regard, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Association*, 528 F.3d 426, 430 (6th Cir. 2008).

**B.    Discussion**

### 1.   The relevant agency agreement

Producers' motion to dismiss is based upon the arbitration provision in the agency agreement.  The amended cross-complaint refers to agency agreements effective on November 11, 2009 (ECF No. 19-1),  January 17, 2011 (ECF No. 19-2), and September 25, 2020 (ECF No. 19-3).  The first question for the Court is which agency agreement controls Producers' motion to dismiss.  The amended cross-complaint alleges that the events commenced on January 20, 2020, the date that Mibelloon emailed a request for QCEs.  The last discussion between cross-claimants and Producers occurred on August 17, 2020, when Godley and Fleming conducted a telephone conference with Producers' representative (Blubaugh), during which Producers claimed that "Breckenridge was 100% responsible for Mibelloon's lack of coverage." PageID.30.

Whether by coincidence or design, Breckenridge signed the 2020 agency agreement on September 24, 2020, the same date that its insurer dated its demand letter to Producers.  PageID.347.  The "Facts" recited in that demand letter commenced on January 21, 2020, and concluded on May 18, 2020.  *See* Demand Letter (ECF No. 19-5, PageID.369-371).  The facts alleged in the amended cross-complaint and the facts recited in the demand letter occurred while the January 17, 2011 agency agreement was in force, i.e., January 17, 2011 through September 24, 2020.  Accordingly, the the Court concludes that the controversy alleged in the amended cross-complaint is subject to the January 17, 2011 agency agreement.

### 2.   The terms of the agency agreement

The arbitration provision at issue in this case appears in Article VIII of the January 17, 2011 agency agreement, which provides as follows:

> **The Company and the Agent agree that they will resolve any dispute between them arising under this Agreement by binding arbitration under the rules of the American Arbitration Association.** No damages or award shall be made to the Agent in excess of any commission owed under this Agreement. With

14

respect to MPCI [Multiple Peril Crop Insurance], the arbitrator(s) shall render a reasoned decision based on the Federal Crop Insurance Act, the FCIC's regulations, procedures, and MPCI policies, this Agreement and the instructions and procedures issued by the Company. With respect to Crop Hail Insurance and Named Peril Insurance, the arbitrator(s) shall render a reasoned opinion based on the policy provisions, the procedures and instructions issued by the Company, this Agreement (as construed under the laws of the State of Texas), and the laws of the state in which the policy is sold. Notwithstanding any other rule or procedures, the prevailing party shall be entitled to recover from the other party its costs and reasonable attorneys fees.

PageID.331-332 (emphasis in original).

As an initial matter, the Court needs to identify the "agent" referenced in the agency agreement. The parties did not identify an authorized agent on page 1 of the agency agreement. While the "Agency Name" is "Breckenridge Insurance Agency of Michigan", the line for the "Authorized Agent's Full Name" is blank. PageID.324. The street address and "Identification Number" appear to be that of Breckenridge, while the email address is "rfleming@biaofmi.com". *Id.* The signature page is similarly incomplete. The "Printed Name of Agency" is "Breckenridge Ins Agency of Michigan." PageID.333. The line designating the "Printed Name of Agent authorized to execute this Agreement on behalf of Agency and individually" is left blank. *Id.* The "Authorized Agent's Signature" is partially illegible, and may be Rob M. Fleming. *Id.*

In Article I: Definitions, the agency agreement defines "agent" and "agency" as follows:

B. "Agent" means the properly trained individual identified on Page 1 and licensed by the State in which an eligible crop insurance contract is sold and serviced, and who is appointed by the Company [Producers], or its designee, to sell and service such eligible crop insurance contracts pursuant to the terms of this Agreement. Where applicable in this Agreement, "Agent" shall also include Agency.

C. "Agency" means the business entity or sole proprietorship identified on Page 1 employing the Agent identified on Page 1 and authorized pursuant to this Agreement by the Company, or its designee, to sell and service eligible crop insurance contracts under the federal crop insurance program and under the Company's Crop Hail Insurance and Named Peril Insurance programs.

15

PageID.324.  Because the parties failed to identify any individual as an "agent", the "agent" authorized to sell and service Producers' crop insurance contract is the agency, Breckenridge.  *See* Article I, ¶ B ("Where applicable in this Agreement, 'Agent' shall also include Agency.").  Based on this record, the "agent" subject to the agency agreement is Breckenridge.

### 3.    Godley

In her response to the motion to dismiss, Godley contends that she is not bound by the agency agreement, stating that the "agency" is Breckenridge and that "nowhere throughout the Agreement is Ms. Godley a party (let alone referenced)".  Response (ECF No. 37, PageID.545).  Godley alleged that she "is an individual who resides in Gratiot County, Michigan, and is employed by Breckenridge."  PageID.298.  In her emails to Producers related to the Mibelloon QCEs, Godley identified herself as "Vice President of Agricultural Services" at Breckenridge, referred to herself "as an agent representing my agency and ProAg", and engaged in negotiations with Producers on behalf of "the clients" (Mibelloon).  *See* ECF No. 19-4, PageID.351.[1]  Godley also signed the January 21, 2020 QCE forms as Producers' agent.  *See* QCEs (ECF Nos. 16-3, 16-4, and 16-5).

---

[1] For example, Godley stated:

What, if any, information can I provide the clients on this to help them make a division? Can I reassure them that your company will take care of this issue if they were to purchase coverage? Because I will let you know now, that is what they will be asking of ProAg if they proceed, and rightly so. I already had this discussion with them on putting coverage in place being that this one was denied. They purchased the coverage timely, I keyed the endorsements timely, I consulted the underwriter prior to coverage going through the RMA PASS system, and inquired why there was not an SOI for these endorsements, only to be told RMA was behind on accepting endorsements. They are willing to work with ProAg, but it has to be favorable to both parties.

So, to get this farming operation to agree to put up $70,000 in additional DRP premium, they have to have something from the company stating they are being taken care of on this issue. I cannot verbally tell them that I had talked with senior management at ProAg and it was discussed that Mibelloon would be taken care of or that we will work something out. That is not fair to the client or to me as an agent representing my agency and ProAg. I am not willing to put my agency or myself out there on a verbal agreement.

Email (May 19, 2020) (ECF No. 19-4, PageID.351).

By her own actions, Godley is identified as an "agent" for Producers. However, Godley did sign an agency agreement with Producers and was not identified as an "agent" in the January 17, 2011 agency agreement. For purposes of the agency agreement, the record demonstrates that Godley was acting in the capacity of a subagent of the agent (Breckenridge). *See* Article I, ¶ O, PageID.325 ("'Subagent' means an agent under contract with or employed by the Agency or Agent.") (PageID.325). The agency agreement addressed the appointments of subagents as follows:

> The Company [Producers] reserves the right to approve or disapprove the appointment of any Subagent. The Agent may appoint Subagents to conduct business under this Agreement, with written Company approval prior to the appointment of a Subagent. Notwithstanding the foregoing, the Company's failure to approve any Subagent in writing shall not prevent the Agent from hiring or retaining such person or entity, except to the extent that such Subagent shall not be authorized or permitted to market or sell the Company's products. Any Subcontract between an Agent and a Subagent shall contain, at a minimum, terms substantially similar to the terms and conditions set forth in this Agreement. Upon written request from the Company, the Agent shall provide the Company with a copy of any and all Subagent contracts. <u>The Agent shall ensure that any Subagent obtains and maintains all licenses, certifications, and proper training as required by FCIC and the several states, as applicable. The Agent shall hold the Company harmless for acts of the Agent's employees and Subagents.</u>

Article II: Agency Appointment, ¶ B, PageID.326 (emphasis added).

The pleadings and related documents demonstrate that Godley was a "subagent" under the agency agreement and was not the "agent" bound by the arbitration clause of that agreement, *i.e.*, "The Company [Producers] and the Agent [Breckendridge] agree that they will resolve any dispute between them arising under this Agreement by binding arbitration under the rules of the American Arbitration Association." PageID.331 (emphasis omitted). In this regard, Breckenridge agreed to hold Producers harmless for the acts of its subagents and employees. *See,*

*e.g.*, Article VI: Errors and Omissions ¶ A[2]; Article II ¶ B.[3]  Accordingly, Producers' motion to dismiss Godley's cross-claims should be denied.

### 4.      Breckenridge

The Court reaches a different result with respect to Breckenridge, the agent under the January 17, 2011 agency agreement.  In the event that Breckenridge is liable to Mibelloon for failing to secure the QCEs, Breckenridge's cross-claims against Producers (breach of contract, indemnification, misrepresentation and fraud) are subject to arbitration under the agency agreement.

The Federal Arbitration Act (FAA) favors the implementation of arbitration agreements, providing in pertinent part:

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The FAA further provides in 9 U.S.C. §4 ("Failure to arbitrate under agreement; petition to United States court having jurisdiction for order to compel arbitration; notice and service thereof; hearing in determination") that,

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the

---

[2] "The Agent is responsible for the acts, omission, commissions, and return commissions of the Agent's and/or Agency's employees, in addition to those of the Agent's Subagents and their agents and employees, as fully as though said acts were performed by the Agent. The Agent further agrees and acknowledges that it shall be liable to the Company for any breaches or violations of the SRA [Standard Reinsurance Agreement] resulting from the acts or omissions of the Agent, its Subagents, or the employees of the Agent or Agency."  PageID.331.

[3] "The Agent shall hold the Company harmless for acts of the Agent's employees and Subagents." PageID.326.

controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . .  The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . .  If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

9 U.S.C. § 4.

In *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308 (1998), the Sixth Circuit discussed enforcement of arbitration agreements under the FAA:

The FAA establishes a "federal policy favoring arbitration . . . requiring that we rigorously enforce agreements to arbitrate." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) (internal quotations and citations omitted).  In *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), the Supreme Court reiterated that general state contract principles, as opposed to state laws applicable only to arbitration provisions, may regulate, and in the appropriate case, invalidate, arbitration clauses. *See id*. 517 U.S. 681, 116 S.Ct. at 1655–56, 134 L.Ed.2d 902 (citations omitted); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) ("When deciding whether parties agreed to arbitrate a certain matter . . . courts generally should apply ordinary state-law principles that govern the formation of contracts.") (citations omitted).

*Andersons, Inc.*, 166 F.3d 308 at 322.

When asked by a party to compel arbitration under a contract, the federal court has four tasks:

first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).

With respect to the first task, the parties' agency agreement included an arbitration provision.  The first page of the agency agreement prominently states, "**THIS AGREEMENT IS**

**SUBJECT TO ARBITRATION**". PageID.324 (emphasis in original). In addition, the agreement includes a separate arbitration clause in Article VIII which states in part, "**The Company and Agent agree that they will resolve any dispute between them arising under this Agreement by binding arbitration under the rules of the American Arbitration Association**." PageID.331 (emphasis in original).

As to the second task, the Court concludes that Breckenridge's claims alleged in the amended counter-complaint fall within the scope of the arbitration clause. This Court examines the language of the parties' agreement in light of the strong federal policy in favor of arbitration, resolving any ambiguities in the contract or doubts as to the parties' intentions in favor of arbitration. *Stout*, 228 F.3d at 714 (citations omitted). "Where the arbitration clause is broad, only an express provision excluding a specific dispute, or 'the most forceful evidence of a purpose to exclude the claim from arbitration,' will remove the dispute from consideration by the arbitrators." *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 577 (6th Cir. 2003), quoting *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986). As discussed, Breckinridge and Producers agreed to "resolve any dispute" under the agency agreement by binding arbitration. PageID.331. This includes Breckenridge's cross-claims, which involve disputes which arose while it was acting as Producers' agent under that agreement.

As to the third task, Breckenridge does not contend that Congress intended to make these types of claims "nonarbitrable." As to the fourth task, the Court concludes that the remaining claims should be stayed pending arbitration.

Based on these considerations, the Court concludes that Breckenridge's cross-claims are subject to the arbitration provision of the January 17, 2011 agency agreement, and recommends that Producers' motion to dismiss Breckenridge's cross-claims be granted.

Finally, the undersigned has considered how to proceed in this lawsuit, which involves both arbitrable and nonarbitrable claims.  In a previous Report and Recommendation (ECF No. 41), the undersigned concluded that Mibelloon's claims against Producers were subject to arbitration and recommended that the Court grant Producers' motion to dismiss and order Mibelloon and Producers to arbitration.  If this recommendation is adopted, then the lawsuit will consist of Mibelloon's claims against Breckenridge and Godley (neither of which are subject to arbitration), Godley's cross-claims against Producers (which are not subject to arbitration), and Breckenridge's cross-claims against Producers (which are subject to arbitration).  Under that scenario, the remaining claims in this lawsuit should be stayed pending resolution of the Mibelloon/Producers arbitration.  If that arbitration does not result in the dismissal of this lawsuit, then the stay should be lifted so that Mibelloon can litigate its remaining claims against Breckenridge and Godley.  At the conclusion of the litigation, Godley can assert her cross-claims seeking indemnification and damages from Producers, and Breckenridge can arbitrate its claims for indemnification and damages from Producers pursuant to the agency agreement.

## IV.    RECOMMENDATION

For these reasons, I respectfully recommend that defendant/cross-defendant Producers Agriculture Insurance Company's motion to dismiss the amended cross-claim and compel arbitration (ECF No. 30) be **DENIED** with respect to defendant/cross-claimant Jessica Godley and be **GRANTED** with respect to defendant/cross-claimant RLS, Limited, d/b/a Breckenridge Insurance Agency.

21

I further recommend that defendant/cross-defendant Producers Agriculture Insurance Company and defendant/cross-claimant RLS, Limited, d/b/a Breckenridge Insurance Agency be **ORDERED** to proceed to arbitration pursuant to the January 17, 2011 agency agreement at an appropriate time.

I further recommend that the remaining claims in this lawsuit be **STAYED** pending further order of the Court.

Dated:  January 7, 2022                    /s/ Ray Kent
                                           United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).